PETER N. PETERS and Others, on Behalf of Themselves and All Other Residents or Property Owners on Riverside Drive in the Borough of Manhattan, County and City of New York, Similarly Situated, Plaintiffs, *v.* ROBERT MOSES, as Commissioner of the Department of Parks in the City of New York, and RIVERSIDE-CLAREMONT RESTAURANT, INC., Defendants.

Supreme Court, Special Term, New York County, June 8, 1939.

*Maxwell Stettner* for the plaintiffs

*William C. Chanler* [*H. Broadman Epstein* of counsel], for the defendant Robert Moses, as commissioner, etc.

*Emil Rogers* [*Eugene Newman* of counsel], for the defendant Riverside-Claremont Restaurant, Inc.

HOFSTADTER, J. Claremont Inn, at One Hundred and Twenty-fourth street and Riverside drive, is an old institution rich in historical incident. Acquired by the city in 1872, it has been under the jurisdiction of the park department, leased at various

times to private persons to conduct as a place of refreshment. Renovated in 1934, it was converted from an expensive to a popular establishment. It consists of an indoor restaurant and bar and also a large *outdoor* pavilion with an *outdoor* modern dance orchestra. The outdoor section is open from about June first to the end of September. And the band plays from seven P. M. *to one A. M.* (on Saturdays and holidays *to two A. M.*). It is noteworthy that this is the *only* open air dance orchestra in a *residential section* in any part of the city.

This action is to enjoin the operation of the inn as a nuisance, claimed to exist because of loud music, excessive noise, heedless conduct of its operators and boisterous behavior of its patrons. Assurances have been given for the correction of many of the offending practices, such as rehearsals of the orchestra at three A. M.; the removal of refuse cans, and deliveries by tradespeople, with attendant clatter and rumbling of trucks, early in the morning; and congested traffic and parking, with resulting clamor and shouting, when the patrons of the inn depart. But the defendants insist upon continuing the outdoor band to the hours above specified — and the residents of the district, claiming that their sleep is disturbed, insist on a earlier hour. This presents the issue as finally drawn.

The impressive showing of the plaintiff upon the trial puts one in mind of the description in *People* v. *Rubenfeld* (254 N. Y. 245, 247): " The sounds of revelry by night, to the accompaniment of drums and brasses, assail the quiet of the vicinage. Neighbors * * * to the right and to the left described the tumult and the shouting with the disturbance of their sleep." The denials of the defendants' witnesses was unconvincing — and I suspect that some of the testimony — that of the employees of the city — was given *in terrorem*. Even without taking account of aging men and women, of invalids and of children and infants, and applying the test of " the effect of the offensive practice upon the reasonable man or woman of average sensibilities," the record made upon the trial established that the inn's outdoor orchestra was a disturbing and disruptive factor in the lives of its neighbors.

People living in communities must endure some discomfort from each other — which is compensated by the advantages of ordered society. And in congested areas of population, with conflicting needs, there cannot be absolute rights — without balancing opposing interest. While older authorities placed emphasis upon the right of the property owner to use his business for a lawful purpose, the modern trend necessarily puts the stress upon the maxim " use your own property so as not to injure another "— and this includes, under the authorities — in this and

other States — the inhibition against, and exemption from, unreasonable noises at unreasonable hours. (*People* v. *Rubenfeld, supra,* catering establishment; *Russell* v. *Nostrand Athletic Club, Inc.,* 240 N. Y. 681, prizefight arena; *Andrews* v. *Perry,* 127 Misc. 320, frankfurter stand; *Murphy* v. *Hitchcock,* 150 id. 36, dog kennel; *Garber* v. *Rubel Corp.,* 160 id. 716, ice factory; *Phelps* v. *Winch,* 309 Ill. 158; 140 N. E. 847, amusement pavilion; *Gilbough* v. *West Side Amusement Co.,* 64 N. J. Eq. 27; 53 A. 289, baseball park; *Snyder* v. *Cabell,* 29 W. Va. 48; 1 S. E. 24, skating rink; *Town of Davis* v. *Davis,* 40 W. Va. 464; 21 S. E. 906, brass band.)

The ancient maxim persists — with altered implication. With changing social conditions, complicating urban life especially, the law must adapt legal principles to meet newly arising necessities. Noise is an inevitable incident to urban life. Lord Byron found "the hum of cities horrible." But he was a misanthrope. An editorial writer suggests that noise is "psychologically relative" and offers illustrations in contrasts. Others readily present themselves. The patter of rain on the roof is soothing — the drip from a leaky drain, distracting. The purr of a motorboat on a distant lake or the clatter of hoofs on a country road may be melodies of a sort, but never an exploding exhaust or racing motor outside your bedroom window. A bugle or a flute at a concert is enjoyable, but hardly a blaring radio or a wailing saxophone in the courtyard. No doubt, as the learned writer concludes: "It is not the clearly unavoidable kind of noise that bothers most people most. It is the seemingly inconsiderate human participation in it that irritates."

The patrons of the Claremont Inn have a right to gaiety and to music; and its neighbors have an equal right to the quiet enjoyment of their homes and to sleep. Where does the right of the former end — when does the right of the latter begin? The old rule has found recent expression — bluntly perhaps but graphically — in "my freedom to swing my arm ends where the other fellow's nose begins." The question is, at what hour should the open air music stop? For "by common consent of civilized man the night is devoted to rest and sleep, and noises which would not be adjudged nuisances, under the circumstances, if made in the daytime, will be declared to be nuisances if made at night and during the hours which are usually devoted by the inhabitants of the neighborhood to sleep." (*Gilbough* v. *West Side Amusement Co., supra.*)

I have not overlooked the circumstance that a department of the municipality is here involved. But neither in reason nor in authority is a municipal corporation or a quasi-public instrumentality entitled to preferential treatment where a case of nuisance has been established. (*Bohan* v. *Port Jervis Gas Light Co.,* 122 N. Y. 18; *Kobbe* v. *Village of New Brighton,* 23 App. Div. 243;

*Nicoll* v. *President & Trustees of Village of Ossining,* 128 Misc. 848.) Indeed, in a moral sense, such an agency may be considered in duty bound to exercise yet greater self-restraint than a private person — in order to prevent a nuisance. And, as already indicated, the sounds of music, if disturbing, may be regarded as such.

" The noise of musical instruments kept up for such periods of time, and at such hours of the day or night as to be really annoying to persons of ordinary sensibilities, or that produce other actual ill results, is a nuisance." (2 Wood on Nuisances [3d ed.], p. 840.)

I do not treat seriously, therefore, the corporation counsel's suggestion that the neighbors of Claremont Inn should find the music late at night conductive to sleep. They have found it *otherwise.* Conceivably, cradle songs or sentimental ballads softly strummed on string instruments might serve, though legendary authority is to the contrary. According to tradition (doubtless based on the verse in the 132d Psalm: " I will not give sleep to mine eyes or slumber to mine eyelids ") David hung a harp above his couch. When the midnight wind blew upon its strings making music, it woke the poet king; he rose from his bed to worship. And his adorations — the words he wedded to such music — are preserved forever as part of our sacred literature in the Psalms. However this may be, it is clear that though the cacophony of a swing band may fill the soul of a jitterbug with rapture, it " fills the air with barbarous dissonance," in the ears of a weary worker woeing " tired Nature's sweet restorer."

The plaintiff would have the music cease at an early hour, perhaps ten o'clock. The inn would continue it as at present to one A. M. and on special nights to two A. M. But the court cannot satisfy the maximum wishes of both parties to the controversy; nor of either. For each party must be made to yield some part of its right — the full enjoyment of which it could exercise only in the absence of any right in the other, and the result is an *approximation* of the right of each as qualified by consideration for the other. Having considered the evidence carefully — supplemented by my personal observations (pursuant to the stipulation of the parties), I am clear that the plaintiff must have relief. And under all the circumstances, having due regard for the rights of all the parties, the court will enjoin the playing of the *outdoor* music after midnight (except Saturday nights and evenings preceding holidays, when it may continue for an additional hour). No other injunctive relief is granted, on the assumption which I regard well-founded, that the assurances for the correction of other abuses will be kept. In the unlikely event that they are not, the relief granted may be amplified on an appropriate application and the decree may provide for amendment at the foot thereof.