## 612 DRISCOLL v. AMERICAN HIDE & LEATHER CO.

CATHERINE DRISCOLL et al., Plaintiffs, v. AMERICAN HIDE AND LEATHER COMPANY and the VILLAGE OF BALLSTON SPA, Defendants.

(Supreme Court, Saratoga Trial Term, February, 1918.)

Injunction — when denied — action to restrain pollution of stream attributed to sewage discharge — water and watercourses — villages.

> Where, in an action brought by various owners and occupants of farm land along a stream below the point of sewer discharge from a village disposal plant to restrain the pollution of the stream attributed to the sewage effluent discharged from the disposal plant and consisting of about one-half domestic sewage and one-half tannery effluent received by the sewage of the village from the defendant mill, all of the waste therefrom consisting of scrapings of flesh, hair, lime and tan bark liquor being screened before entering the village sewers and chlorinated on its journey to the sewage disposal plant, it appears from the expert testimony that the stream is not presently polluted and the testimony of laymen as to its condition is in conflict, and the consequences of an injunction would amount to a public calamity, the same will be denied.

> The lay evidence corroborated by the testimony of the experts being sufficient to warrant a recovery of damages for pollution prior to the installation of a liquid chlorine system and a screen at defendant's plant, plaintiffs may have recovery for diminished rental value from that time to six years prior to the institution of the present action.

> Plaintiffs are also entitled to recover for loss of cattle during the same period.

TRIAL before the court, without a jury.

E. T. Brackett, for plaintiffs.

M. H. Wynne, for defendant American Hide and Leather Company.

Edward S. Coons, for defendant Village of Ballston Spa.

KELLOGG, J.   These actions are brought to procure injunctions restraining the pollution of the Kayaderosseras creek, in the county of Saratoga, and for damages.   The pollution complained of is attributed to the sewage effluent discharged from the sewage disposal plant of the village of Ballston Spa.   This sewage discharge consists of about one million gallons a day, consisting of about one-half domestic sewage, and one-half tannery effluent received by the village sewers from the mill of the American Hide and Leather Company.   That mill in the course of a year receives about 300,000 hides, which it transforms into leather.   Among other trade wastes from the mill are scrapings of flesh, hairs, lime, and tan bark liquor.   All of this waste is screened before entering the village sewers, and is chlorinated on its journey to the sewage disposal plant. At this plant the combined tannery and domestic sewage is subjected to bacterial action in septic tanks, and oxidation upon contact beds of broken stone, before its discharge into the river.   The plaintiffs are various owners and occupants of farm land along the stream below the point of sewer discharge from the disposal plant.   They complain of loss of rental value, and of a large number of cattle and horses through the disease known as anthrax, the disease being attributed to bacteria from the foreign hides which are tanned at the mill of the American Hide and Leather Company.

Ordinarily, the very nature of the effluent from the tannery and the village sewers would be sufficient to establish pollution, and determine its source.   Because of the screening and chlorination at the tannery, and the septic and oxidizing treatment at the disposal plant, no such presumption can arise from the mere fact that the discharge is sewage.   This is particularly true for the reason that upon this stream above the point of sewage discharge there have been situate for

614 DRISCOLL v. AMERICAN HIDE & LEATHER CO.

Supreme Court, February, 1918.          [Vol. 102.

many years nine or ten paper mills which have been
more or less continuously in operation. These mills
have discharged their trade wastes, consisting of wood,
wood fibre, and in some instances of sulphurous acid,
into this stream.

As illustrating the need of distinguishing between
polluting solids to be found in the stream, and the
fallacy of the argument that because there is pollution
these defendants, from the very nature of their effluent,
must have caused it, there may be instanced the case of
*Whalen* v. *Union Bag & Paper Co.*, 208 N. Y. 1.
In that case a sulphide mill, representing an invest-
ment of more than $1,000,000, was restrained from
polluting the Kayaderosseras by discharging its mill
effluent into the stream at a point upstream from these
defendants. As a result that mill has been shut down
ever since the year 1913.

Many lay witnesses were called by the plaintiff to
establish the source of pollution to be the effluent of
these defendants. They have sought to identify pol-
luting solids, as fleshings, and hairs, and thus to involve
the tannery; they have ascribed a tan bark color to the
stream, and sensed a smell of decaying organic matter
rising from its waters, in furtherance of the claim that
its cause was mill and village sewage. Briefly their
testimony is as follows:

Driscoll saw particles floating as big as the end of a
finger, kind of a slimy, greasy moss with hair in it.

Slade said the water was black, thick, heavy, full of
hair.

Seaman did not identify what he found as fleshings,
but in the dirt along the edge of the stream saw little
hairs, some white, some dark, some red.

DuBois identified no fleshings, but saw a scum
along the bank with hairs in it, some dark, some light.

He also sensed an odor so strong that he had to close the windows of his house.

Rowley could identify no fleshings, but observed the bed was covered with slime, and when he held a bush in the stream it gathered filaments, some wood fibres, some hair, but since the Union Bag mill closed there was no smell of putrefaction.

Ramsdill saw no fleshings and identified no hairs, but observed slime in the water, and detected an odor like grease, like a tannery, and saw slimy stuff gathered on the bushes.

Ramsdill said when the Union Bag mill was running the water had a yellow milky cast, but now it was black and muddy.

Driscoll on the contrary found the water not quite so dark since that mill shut down.

Jones found small particles, half an inch long, three-quarters of an inch, a quarter of an inch, running through the creek, and a coating on the grass with hairs in it. He noticed an odor from the stream like that of a tannery.

Eddy found the water full of a substance which kept turning over and over, some days an inch in diameter, and some days smaller, with lots of white particles mixed through it. He found hairs or a small substance on the bushes, but noticed that the scum on the meadows had disappeared since the sulphide mill closed down.

All of these witnesses, except Jones, are riparian owners or dwellers upon the creek, and many of them have claims against these defendants.

On the other hand the witnesses Mitchell, Streever, Watkins and Wood found no fleshings or hair in the stream. Streever thought he had found hair, but discovered it to be wood fibre.

The same witnesses and Eddy, Parks and Pearse

discovered no putrescent odor. Streever sensed a swamp smell at the outlet of the creek.

Many of the witnesses found the water dark because of the darkness of the river bed, but when taken from the stream it was as light as any water. Some of them drank the water. Some found it more palatable than well water.

A large number of fishermen were called who had fished the stream within the last few years, and made large catches of perch, pike and bass. Some had been caught directly opposite the discharging pipes of the sewage plant. The testimony was given as establishing the presence of free oxygen in the stream, a condition hostile to putrefaction and contradictory thereof.

This is substantially a summary of all the lay testimony upon the subject. Much of it relates to a period when the tannery effluent was unscreened and unchlorinated, and the presence of fleshings and hairs in the stream was thus rendered possible. It does not illumine the present situation, and while it may have some bearing upon the question of damages it has little if any upon the issuance of an injunction.

On behalf of the plaintiffs, Professor Anthony and a chemist named Ant took samples of the sewage effluent.

Ant found sample C, raw sewage, high in organic matter. It was of a dark reddish brown nature, had a putrid odor, and there were pieces of material which would look a good deal like fleshings. The oxygen was high and the bacterial count somewhat low.

He found sample D, treated effluent, somewhat improved in suspended solids, and the material was turned from a reddish brown color to a very black.

He found the creek water above the plant normal, and two miles below somewhat high in organic matter with an increase of fifty per cent of chlorine.

At this time the tannery effluent was treated with hypochlorite of lime. This had an oxidizing or burning effect upon the solids. It released oxygen which was hostile to the anaerobic bacteria. In the course of half or three-quarters of an hour the tannery effluent joining with the domestic sewage reached the receiving basin of the disposal plant. From here it was pumped into septic or settling tanks to remain eight or ten hours. It was then poured out upon contact beds, or beds of broken stone in water tight compartments. The purpose of the septic tanks was to liquify or gasify the solids through the action of the anaerobic bacteria. These bacteria, as their name indicates, perform their work in the absence of air or oxygen. They hasten putrefaction and destruction of organic solids. The purpose of the contact beds was to take the solid residue from the septic tanks and purify it by oxidation.

It was the opinion of Ant that a septic process was started in the tanks which was not completed. In other words, that septic action was retarded in the tanks, so that putrefaction continued on the contact beds and afterwards in the stream.

Anthony found the contact beds so clogged that the sewage was getting no oxidation, but continuance of the septic process. It seemed to be his opinion that chlorine injected at the plant did not have sufficient time to act before the effluent arrived at the septic tank to break down the solids; that the chlorine acted to deter bacterial action; and thus undestroyed solids came to the contact beds in a septic state, and there through clogging oxidation was inhibited. Both Ant and Anthony detected chlorine in the disposal effluent.

The experts for the defendant, Eddy and Johnson, both testified that if sample D was a fair sample of the effluent from the disposal plant that plant was not

working to high efficiency or satisfactorily. Johnson said such an effluent would cast a heavy burden upon the stream.

One difficulty with sample D is that it was taken in August, 1915, when the screening and chlorinating system at the tannery was entirely different from what it became shortly thereafter.

At this time the only screening done was by means of quarter inch rods set one-half inch apart. Later the Riensch Wurl screen was installed, and went into operation on February 22, 1916. This screen consists of a revolving perforated circular brass plate set almost vertically in a channel which it completely blocks. More than half of it is submerged in the flowing sewage. As that effluent comes down, the liquid passes through the perforations in the revolving plate. The diameter of each perforation is one-thirty-second of an inch. The solids are lifted by the plate as it revolves, and when by its turn they are above water they are swept therefrom by revolving brushes and carried to the surface of the ground. It is quite evident that no fleshings and few hairs could pass through the holes in the screen, which as said were but one-thirty-second of an inch in diameter.

Jackson states the reason for the installation of this screen: " There were at times particles of rather larger size than ordinary which would not be properly penetrated by the chlorine gas. If the particles coming from the factory are of too large a size, there might be at times a possible lack of sterilization, a lack of penetration of those larger particles."

Also, at the time of the taking of samples D chlorination was done by means of hypochlorite of lime. In September, 1915, a liquid chlorine plant was installed. Liquid chlorine pound for pound has three times the chlorine content of hypochlorite of lime. By using

three pounds of the latter for one pound of the former you would get the same amount of chlorine. The action would not, however, be as speedy or as effective in the presence of a large amount of organic matter.

Johnson says of the use of liquid chlorine: " As soon as the chlorine is released in the water it releases oxygen and immediately becomes an extremely active oxidizing agent, and as it seeks out organic matter to oxidize it naturally will seize upon that the quickest." He further says: " Organic matter is not such a disturbing factor with chlorine gas."

Jackson says there may still be chlorine left over when the sewage reaches the sewage basin, but it remains in that basin six and a half hours, so there is no possibility of any chlorine being in the septic tanks. He says: "At the end of a few hours you have anaerobic bacteria, you have six and a half hours in your receiving chamber, and you have got seventeen hours, which is much too long for that purpose, in the septic tanks."

The changes made since sample D was taken and since the condition existing in August, 1915, when Anthony and Ant got their data, accomplished these results: *First.* Organic solids were largely screened out from the tannery effluent, particles not larger than one-thirty-second of an inch being allowed to pass through. *Second.* Chlorination was speedier and more complete both because of the screening and because of the substitution of the quickly penetrating chlorine gas. *Third.* Less organic matter and the more efficient chlorine gas causing greater oxidation brought less solids to the septic tanks and less chlorine. *Fourth.* Less organic matter and less chlorine diminished the previous retardation of bacterial action in the septic tanks. *Fifth.* Less organic matter in a state of greater

destruction passed to the contact beds, diminishing the clogging and increasing oxidation.

Upon the subject of present pollution, therefore, and the necessity of an injunction, sample D and the testimony of Anthony and Ant are not informing.

In drawing the conclusion that because of general pollution the plaintiffs are not entitled to an injunction I should be happier were I supported in my views by chemical analyses of samples of creek water taken above and below the disposal plant, indicating an absence of increase in putrescent matter in the latter over the former. A failure to make such a comparison is somewhat significant. However, in the face of the expert opinion of such distinguished authorities as Jackson, Johnson and Eddy, that the stream is not now polluted, and in view of the wide contradiction between laymen as to the condition of the stream I do not feel justified in decreeing the issuance of an injunction the consequences of which would amount to nothing less than a public calamity.

The lay evidence, however, corroborated by Anthony and Ant, is sufficient to warrant a recovery of damages for pollution prior to September, 1915. The plaintiffs may therefore have recovery of diminished rental value from that date to six years prior to the institution of the action.

Testimony given as to rental value is, on the part of the plaintiffs, very extravagant, and upon the part of the defendants very belittling. However, I think I am safe in placing the diminished rental value of the Driscoll, Muldowney and Ramsdill farms at $150 per year, and that of the Baker, Lasher and Waring places at $50 per year. Owing to the fact that paper mills upon the river also pollute its waters, it is fair to charge against these defendants only one-half of the diminished rental value.

The plaintiff Ramsdill may also have recovery for the services of a physician in the sum of thirty-four dollars, which I believe forms a better basis by which to judge his distinguished ability than the sum of five hundred dollars which he believes himself worth for seventeen calls.

The anthrax question remains for determination.

Anthrax broke out upon the river on September 4, 1913. Thereafter the following animals died as follows:

September 4, 1913 ....... 2 cows .......... Slade
September 4, 1913 ....... 4 cows ....... Sherman
February 20, 1914 ....... 1 cow ......... Driscoll
August 23, 1915 ......... 1 cow ......... Driscoll
September 10, 1915 ...... 1 cow ............ Gray
September 12, 1915 ...... 1 horse ........ Driscoll
September 19, 1915 ...... 1 cow ......,.. Seaman
September 30, 1915 ...... 1 heifer ....... Seaman
October 11, 1915 ........ 1 cow ....... Ramsdill
October 22, 1915 ........ 1 cow ......... Seaman
November 15, 1915 ...... 1 cow ...... Muldowney
December  4, 1915 ....... 1 heifer ....... Driscoll
December 12, 1915 ....... 1 cow ...... Muldowney
December 15, 1915 ....... 1 cow ........ Seaman
December 18, 1915 ....... 1 cow ...... Muldowney
December 27, 1915 ....... 1 cow .......... Pratt
January  3, 1916 ........ 1 cow ...... Muldowney
January  3, 1916 ........ 1 cow ...... Muldowney
January  9, 1916 ........ 1 cow ......... Driscoll
January 13, 1916 ......... 1 bull ......... Driscoll
January 19, 1916 ........ 1 heifer ....... Driscoll
January 28, 1916 ........ 1 cow ........... Baker
February  4, 1916 ....... 1 cow ......... Driscoll
February  5, 1916 ....... 1 cow ...... Muldowney
February 12, 1916 ....... 1 cow ...... Muldowney
March  7, 1916 .......... 1 cow ...... Muldowney

March 13, 1916 .......... 1 cow ...... Muldowney
April   3, 1916 ........... 1 cow ...... Muldowney
April   6, 1916 ........... 1 cow ...... Muldowney
April 15, 1916 ........... 1 cow ....... Muldowney
April 16, 1916 ........... 1 cow ...... Muldowney
April 17, 1916 ........... 1 cow ...... Muldowney
April 18, 1916 ........... 1 heifer ...... Ramsdill
April 22, 1916 ........... 1 cow ........ Ramsdill

It will be observed that six cows died in September, 1913, and one cow in February, 1914. The disease did not again appear until September, 1915, from which time on cattle died every month until April, 1916. From that day to this no anthrax has been known upon the stream.

The deaths occurring in September, 1913, were investigated by bacteriologists, and anthrax germs were at once detected.

In August, 1915, Professor Jackson, acting for the defendants, found the anthrax bacilli in the effluent from the tannery. He continued to find them until December, 1915. This occasioned the installation of the Riensch Wur! screen in February, 1916, since which time no anthrax germs have been isolated.

The complete cessation of anthrax upon this stream since April, 1916, following the installation at the tannery of the liquid chlorine system in September, 1915, and the Riensch Wurl screen in February, 1916, is proof that no injunction is now required to remove the danger of anthrax infection. The case is otherwise concerning damages.

It has been shown that pollution of the stream was created by these defendants through the discharge of trade and domestic sewage, and that this pollution continued until at least the month of September, 1915, when the liquid chlorine plan was adopted. Up

to that date, therefore, these defendants were creating and continuing a nuisance. Such being the case they were liable for the natural and probable causes thereof, within which anthrax infection may be classed. As said in 4 Ohio, 376: " If an individual erects a mill dam which creates disease and sickness he must be responsible for the consequences." Since September, 1915, they must be held liable for the reason that Professor Jackson having in August, 1915, definitely detected the presence of anthrax bacteria in the tannery effluent it was a wrong for the defendants thereafter to drain the disease laden sewage into the Kayaderosseras creek.

The plaintiffs may have recovery, therefore, for the value of their cattle. The Ramsdill cow and heifer are valued at ninety and seventy-five dollars respectively. Other cows are valued at sixty-five dollars each, heifers at thirty dollars, bull at fifty dollars, and horse at two hundred.

Judgment accordingly.