Matthew M. Dunne, J.
The following decision and determination of damages was written in 1971.
*835 After the trial, settlement negotiations continued in which the court participated, and all the attorneys agreed to extend the time for the decision, though made, to be handed down, until such of the cases as could be, or all, were settled.
After lengthy and patient negotiations the Boomer case was settled and discontinued. Later, the Meilak case also was settled and discontinued. This left only the Kinley case, and settlement of it not having been accomplished, the attorneys for Kinley and Atlantic now request the decision.
In order that the complete thrust of the court’s reasoning might be more readily ascertainable, no changes or deletions in the original decision have been made except that the determination of value and damages as to Boomer and Meilak has been excised.
We have been directed by the Court of Appeals “ to grant an injunction which shall be vacated upon payment by defendant of such amounts of permanent damage to the respective plaintiffs as shall for this purpose be determined by the court.” (Emphasis supplied.) (Boomer v. Atlantic Cement Co., 26 N Y 2d 219, 228 [March 4, 1970].) The court described these permanent damages to be such as ‘ ‘ would compensate them [the plaintiffs] for the total economic loss to their property ” (p. 225), and used the words (p. 227), “permanent damages ‘ present, past, and future”’, and stated (p. 226), “All of the attributions of economic loss to the properties on which plaintiffs’ complaints are based will have been redressed ”, adding “ The theory of damage is the servitude on land ’ of plaintiffs imposed by defendant’s nuisance.” (p. 228; emphasis supplied).
The closing paragraph of the decision leaves this court “ entirely free to re-examine this subject ” of permanent damages. We “may again find the permanent damage already found; or make new findings ” (p. 228).
Reference should be made to the long history of this litigation. In 1962 defendant began the operation of a large cement plant at Ravena, about 11 miles below Albany. In 1964 the plaintiffs, neighboring landowners, commenced their actions of injunction and damages alleging injury to property from dirt, smoke and vibration emanating from the plant. A lengthy trial by the court without a jury in 1967 resulted in a judgment establishing a nuisance, but refusing an injunction, and awarding temporary damages to June 1, 1967; it specifically made no finding beyond that date, but, for the guidance of the parties only, did find permanent damages if the parties stipulated to the payment and acceptance thereof, which they did not do.
*836 After being through the Appellate Division (30 A D 2d 480 [1968]; 31 A D 2d 578 [1968]; 30 A D 2d 254 [1968]), and the Court of Appeals (Boomer v. Atlantic Cement Co., supra), four of the original seven cases were settled during retrial in September, 1970, leaving the above three cases which were retried in April and May 1971, and to which this court now directs its decision.
On retrial in April and May of 1971, the plaintiffs testified that the conditions then were the same as before. The defendant introduced testimony that it had made three significant developments in the control of emissions: 1. It had converted the primary fuel of the plant from coal to oil. 2. It had put “ an additional spray system in the conveying apparatus from the quarry to the stockpiles at the plant site.” 3. It had replaced the multiclone dust collectors on the clinker cooler with a fiberglass bag-type collector all at the cost of $1,600,000. The rest of the testimony consisted mainly of experts in the field of real estate.
Plaintiffs’ Eanley property is referred to as a 283± acre dairy farm, consisting of a main house with various appropriate barns and farm buildings, including two silos, and three tenant houses, all rented. The property is situated on both sides of Route 9W; and plaintiffs seek $970,000.
Plaintiff’s Boomer property is referred to as about 8 acres, on which are situated a garage in which plaintiff conducted a used auto parts business and did auto body and fender work, and two small one-car garages, one metal, on the westerly side of Route 9W; and plaintiffs seek $350,000.
Plaintiffs’ Meilak property, about 5% acres on the westerly side of Route 9W, consists of a one-family home where plaintiff lived, together with a concrete block type garage used by Mr. Meilak as a truck repair shop and more recently a mobile homes sales lot; and plaintiffs seek $150,000.
The plaintiffs contend that the usual fair market value rule of damages, established under the “ just compensation ” requirement of section 7 of article I of the New York State Constitution, where private property is taken for public use, should not be applied in this private litigation, citing Brevoort v. Grace (53 N. Y. 245, 256) where Judge Grover stated: “If the power exists to take the property of one without his consent and transfer it to another, it may as well be exercised without making compensation as with it, for there is no provision in the Constitution that just compensation shall be made to the owner when his property shall be taken for private use ”, and Matter of New *837 York City Housing Auth. v. Muller (270 N. Y. 333, 343) where Judge Crouch stated: “ Nothing is better settled than that the property of one individual cannot, without his consent, be devoted to the private use of another, even when there is an incidental or colorable benefit to the public.”
Instead the plaintiffs contend that we should use a “ special ” market value rule and a so-called “ contract price ” theory. The “ special ” market is claimed to be based on inflated prices paid by defendant for other properties in the neighborhood.
Under plaintiffs’ ‘ contract price” theory, i.e., the amount that a private corporation would have to pay where it needs such servitude to continue in operation as against a seller who is unwilling to sell his land, plaintiffs ask ‘ ‘ heavy damages as will set notice to all the world that an industry cannot move into a town for the first time, an unindustrialized town, with a rural suburb and setting, and cast the substances, pollute the air and the lands of its neighbors, and to blast without any thought of compensation ___
Simply stated, this is asking for punitive damages and invoking the aid of equity to formulate policy. The Court of Appeals, in this case (Boomer v. Atlantic Cement Co., 26 N Y 2d 219, 223), has rejected the latter, and the present court rejects any notion of punitive damages, since we do not see that the “ wrong complained of is morally culpable, or is actuated by evil and reprehensible motives ”. (Walker v. Sheldon, 10 N Y 2d 401, 404.)
The defendant, insisting on strict compliance of the market value rule, urges that any other considerations would be speculative and uncertain. We disagree and refer to the case of Wakeman v. Wheeler & Wilson Mfg. Co. (101 N. Y. 205, 209), where, in writing of damages, the court says: ‘ ‘ They are nearly always involved in some uncertainty and contingency; usually they are to be worked out in the future, and they can be determined only approximately upon reasonable conjectures and probable estimates * * * But when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. ” And at p. 215, we find: “ Under the Civil Damage Act (Chap. 646 of the Laws of 1873), and under the acts allowing the next of kin of one whose death has been caused by the wrong or carelessness of another to recover damages for such death, the amount of damages are exceedingly uncertain, problematical and contingent, and yet they must be left to the determination of a jury upon such facts as can be *838 proved (Etherington v. R. R. Co., 88 N. Y. 641; Houghkirk v. D & H. C. Co., 92 id. 219.) ”
And see Rusciano Constr. Corp. v. State of New York (37 A D 2d 745, 749), where the court stated: “The impossibility of establishing a precise formula for computing damages should not foreclose the claimants’ clear right to recover. (Westcott v. State of New York, 264 App. Div. 463.) ”
And in Schell v. Plumb (55 N. Y. 592), it was held that an agreement by one party to support another during life is an entire continuing contract, and that upon a total breach thereof the latter may recover full and final damages, not only the expenses of support up to the time of trial, but all the prospective expenses during life, and that the Northampton Tables were competent evidence as to the probable duration of life. Grover, J., writing the opinion, said (p. 597): “ The counsel for the appellants insists that such cannot be the rule, for the reason, as he insists, that it is impossible to ascertain the damages, as the duration of life is uncertain, and a further uncertainty arising from the future physical condition of the person. Guthrie v. Pugsley, (12 Johns, 126) and Wager v. Schuyler (1 Wend., 553) show that the former reason has no force. In each of these cases the value of a life estate in real estate was determined in actions upon the breach of covenants of warranty, as to which the uncertainty as to the duration of life was the same as in the present ease. It may be further remarked that in actions for personal injuries the constant practice is to allow a recovery for such prospective damages as the jury are satisfied the party will sustain, notwithstanding the uncertainty of the duration of his life and other contingencies which may possibly affect the amount.”
As to the plaintiffs’ theories of damages, we concede that, even in cases of eminent domain, there is much discontent today with the fair market value rule. An interesting, exhaustive and helpful review of the subject is contained in an article by W. Harold Bigham of Vanderbilt University Law School, published in the New York Law Journal on April 28, 29 and 30, 1971. And we concede also that the theory of damages in those cases is being broadened. See Keinz v. State of New York (2 A D 2d 415), where the chief question presented was whether ‘ loss of view ’ was correctly held compensable. The court held it was, saying (p. 417): “We must determine the fair market value of the premises before and after the appropriation, and if any factor having a bearing on that value is disregarded, then the constitutional requirement of just compensation is not satisfied. We *839 believe that reductions in value due to impairment of view must be considered * * The extent of the reduction is no more speculative than many other factors affecting value ”.
Thus, to the extent that we hold the fair market value rule is not the sole criterion in determining the permanent damages in this case, we agree with the plaintiffs.
The carefully chosen words of the Court of Appeals in its directions to us, fully quoted in the opening paragraphs of this decision, persuade us that the word “ permanent ” should be given its simple, everyday meaning, particularly in a court of equity, and in a case as difficult of determination as this one. We are to look at all the elements of damage; to “ fully compensate ” the plaintiffs for the total “economic loss” to their properties, and we are told, for the first time in this State, that the theory of damage is the ‘ ‘ servitude on land ’ ’ of plaintiffs imposed by defendant’s nuisance. In the same way as juries award damages for permanent injuries, it seems not improper in the circumstance of this case for a court of equity to do so, and to award “ an amount sufficient to indemnify the party injured for the loss, which is the natural, reasonable and proximate result of the wrongful act complained of ’ ’ (Baker v. Drake, 53 N. Y. 211, 216).
Insofar as any of the plaintiffs ’ theories help us to determine permanent damage, we .shall consider them. As to the ‘ ‘ special market ’ ’ theory it is clear that in many instances the defendant paid inflated values, but there is testimony that in at least four instances relied on by the plaintiffs, defendant was paying not for the land alone, but for ‘ the probably thousands of tons of limestone beneath these lands.”
And all the experts agreed that all the lands in question had increased in value since 1962.
As to the so-called “ contract price ” value, it appears highly speculative. On cross-examination Mr. Boomer testified that he arrived at the price of $350,000 thusly:
“Q. Now, this price that you put on this land of $350,000, how did you arrive at that figure?
mb. DtruoAN: Your Honor, I object again. The roan gave the price as to what he felt it was worth to give to Atlantic. He is taking an old Bill of Particulars from 1964 to impeach him. This is the price the man said he wanted.
the cotjbt: Overruled.
A. (continuing). I have got two small boys that would like to go in the salvage business. The youngest one is 11 years old. Now, between the time he gets to where he can run this salvage business and the time he retires at 65, there is a lot of space in between. $350,000 falls in there.
*840 by MR. tracy (continuing):
Q. That’s what you based it on?
A. On my children, yes, sir.
Q. And that is the basis for your putting the figure of $350,000 on it?
A. Yes.”
And plaintiffs’ expert Mulligan, having put a value of $92,700 on the Boomer property, when asked on cross-examination how he arrived at the so-called “ contract price ” of $250,000, testified :
“ Q. You would put a figure of two to three times the valuation of the $92,700, correct? . ,
A. I stated first that I would not sell for market value, that I would use A' factor of two or three times the market value.
Q. And you said something about $250,000?
A. Yes.
Q. Now, you could have said four or five times the valuation, correct?
A. Yes.
Q. You could have said six or seven times the valuation, correct?
A. No, I don’t think I could have gone that high.”
Again, plaintiff Boomers ’ expert Meisner valued the property at $10,000 an acre, total $80,000, without the nuisance; and with the nuisance he testified:
“ A. There wouldn’t be no value ”.
And Boomers’ witness Mulligan testified to a value of $97,700 without the nuisance. With the nuisance he testified :
“ A. Under all the conditions that you stated, as a second hand and used parts enterprise, probably $5,000.”
Whereas, defendant’s expert, MacKay, said he had been unable to find a “ chínese copy ” of the Boomer property:
“ Q. When you say a ‘chínese copy’, you, I assume, mean an exact copy”.
A. An exact duplicate, yes.”
And, having fixed a fair market value of $36,000 on the Boomer property in 1971, he fixed a value with the nuisance at $27,000 and admitted on cross-examination that in 1967 he had testified that the fair market value then was $18,500.
And there was great variance in values among the experts themselves in this case. Defendant’s expert Boulton testified that the total value of the Kinley property in 1971 without the nuisance was $210,000, whereas Kinleys’ expert McGuire testified to a value of $420,500.
And Kinleys’ expert McGuire, depending on which of three valuation methods used, testified to three different values.
1. Highest and best use using several sales as a basis — $420,500.
2. Special market value created by sales to the defendant— $840,000.
*841 3. “ Contract price” value for servitude — $918,900.
And with the nuisance, McGuire’s opinion of value of the Kinley property was $25,000, as shown in his cross-examination, and he further testified that the main farmhouse, and the barns, and the three tenant houses all had no value and that he was ascribing the $25,000 value to the land.
McGuire further testified that in 1967 he had stated his opinion of fair market value of the Kinley property as of 1962, prior to the advent of defendant, to have been $243,336.
Whereas defendant’s expert MacKay placed the following
values on the Kinley property:
Fair market value 1971 .................. $140,000 Market value with nuisance 1971 .......... 105,000 Fair market value 1967 .................. 117,800.
And plaintiff Meilaks ’ witness Scarborough valued the Meilak property without the nuisance at $90,000 and with the nuisance at $4,000, admitting that in 1967 his opinion of the fair market value was $39,347.56.
As against the plaintiff Meilaks ’ values, defendant’s expert Boulton put the following values:
Fair market value 1971.................... $48,000 Value with nuisance 1971 ................... 40,800. And defendant’s expert MacKay put the values at: Fair market value 1971........i........... $34,800 Value with nuisance 1971 .................. 26,100.
Defendant’s expert MacKay on cross-examination concerning the Meilak property testified:
“Q. Obviously it’s not an exact science, is it?
A. No, sir.
Q. And would you say that ten different appraisers viewing this property and using the same three methods would come up with varying opinions as to value?
A. I would say that’s right, yes, sir.”
And continuing:
“ Q. So, in effect, we could have 10 or 15 people here and get 10 or 15 different— - opinions ?
A. I would agree with that.”
As against plaintiff Kinley s’ experts’ values, defendant’s expert Boulton’s opinions, without and with nuisance* were:
1971 without nuisance..................... $210,000 1971 with nuisance........................ 185,250 1967 without nuisanóo ..................... 176,400 1967 with nuisance........................ 155,610 1962 without nuisance .................. 141,120
and he testified:
*842 “Q. Is the appraisal of a dairy farm different from the ordinary methods, usual methods of appraising real estate?
A. It's considered unique."
He said on cross-examination that his nearest comparable was ‘ about 28 miles ” away from the Kinley farm, and the farthest was “ between 45 and 50 miles ” away.
As to price per acre of farmland, he .said :
“Q. Have you ever heard of farmland going for $1,000 an acre?
A. I have not.”
And we note the following:
“Q. Are you stating for this record, Mr. Boulton, that cost less depreciation is never used to establish fair market value on farms ?
A. On farm buildings, that is absolutely correct.
Q. So that Mr. MacKay, a prior appraisal for the Atlantic, if he made such findings, he was in error, is that correct ?
A. (continuing). He did not use sound appraisal principles.”
And he frankly admitted:
“ Q. In how many other matters have you testified where a nuisance was involved?
A. I think this is my first.”
American Jurisprudence (Second Spries, Vol. 22, Damages, § 133, p. 193) states: “ Valuation of real property, generally. The valuation of real property is an imprecise process, since real estate has no inherent value readily ascertainable by an appraiser or by the court. ’ ’
And New York Jurisprudence (Vol. 13, Damages, § 87, p. 550) states: ‘ ‘ The general rule of diminution in value is incapable of application in some cases and is subject to some exceptions, it being difficult to formulate a general rule that would apply to all cases of permanent injury to real property.”
The evidence in this case amply demonstrates the validity of the above-quoted statements.
And we may note, in passing, what the Court of Appeals wrote concerning expert evidence, in Ferguson v. Hubbell (97 N. Y. 507, 514): “It is generally safer to take the judgments of unskilled jurors than the opinions of hired and generally biased experts. A long time ago in Tracy Peerage (10 Cl. & Fin. 154, 191) Lord Campbell said, that skilled witnesses came with such a bias on their minds to support the cause in which they are embarked, that hardly any weight should be given to their evidence. Without indorsing this strong language which is, however, countenanced by the utterances of other judges and of some text writers, and believing that .ppinion evidence is in many cases absolutely essential in the administration of justice, yet we think it should not be much encouraged and should be *843 received only in cases of necessity. Better results will generally be reached by taking the impartial, unbiased judgments of twelve jurors of common sense and common experience than can be obtained by taking the opinions of experts, if not generally hired, at least friendly, whose opinions cannot fail generally to be warped by a desire to promote the cause in which they are enlisted ”.
The thoughts expressed in characterizing the evidence in two separate cases involving value seem appropriate to the instant case. In Driscoll v. American Hide & Leather Co. (102 Misc. 612, 620), the court wrote: “ Testimony given as to rental value is, on the part of the plaintiffs, very extravagant, and upon the part of the defendants very belittling ’ ’.
And in Rock v. Belmar Constr. Co. (141 Misc. 242, 244) the court said: ‘ ‘ Twelve thousand dollars would be a dozen times the value of the whole farm for taking rock on an half acre thereof. Such an amount seems excessive and, if trebled outrageous. Twenty-five dollars for practically all the stone that went into twelve miles of State road also offends common sense.”
Thus, it will be seen that while the fair market value rule may not be the sole criterion, it does serve as a restraining influence on the possible excessiveness of the so-called “ special ” market value, and as a sure check on the subjective and speculative nature of the so-called “ contract price ”.
This case is different in that no part of any of the plaintiffs’ properties has been or will be “ taken ”, in the usual meaning of that word. The title to all the property remains in the plaintiffs. They have all the property today which they had prior to 1962 and will continue to have it in the future.
Plaintiffs Kinley and Meilak continue to live and do business there and Boomer continues to do business there. But they do so having their properties in a certain condition of serfdom or bondage, to wit, a “ servitude ”.
It is no easy task, under the conditions of this case, to determine the amount of permanent damages, past, present and future.
In a particularly difficult decision involving the valuation of an entire railroad system, including tunnels and subways, where an award of $55,000,000 was made, after exhaustively reviewing different methods of valuation, the court finally wrote: “If analogy is found in Newton’s experiment with prisms showing that white light is composed of all the colors of the spectrum, each lending its own characteristics to a degree when passed through a prism, all the approaches to valuation entering into *844 the informed mind and sensitive conscience of the court lend to an appropriate degree in the resulting decision.” (Matter of Port Auth. Tram-Hudson Corp., 48 Misc 2d 485, 535).
In determining permanent damages we have noted:
1. The temporary damages already found insofar as they assist us.
2. The damage from September 1, 1962 to date.
3. The fair market value with and without the nuisance.
4. The consideration of plaintiffs’ theories.
5. The future damages.
And applying the statement above quoted from the Port Authority case, we find the permanent damage to the plaintiffs to be:
Kinley ................................... $175,000.
We mad the fair market value without and with the nuisance to be:
Kinley:
Without nuisance ........................ $265,000 With nuisance .......................... 125,000.
In accord with the decision of the Court of Appeals, the plaintiffs Kinley are granted an injunction which shall be vacated upon payment by the defendant of the sum of $175,000.
This case was tried by the court, without a jury, and findings of fact and conclusions of law were waived by both sides.
Any trial motions inconsistent with the above are denied.