*447 OPINION OF THE COURT
Lucindo Suarez, J.
The issue presented in this action is whether a neighbor’s persistent, loud and intense sounds from heavy metal rock band practice, amplified home stereo and guitar music, and portable and automobile radios, over a three-year period, condoned by the owner of the premises, are sufficiently objectionable in nature, extent and degree, to deprive homeowners of the beneficial use and enjoyment of their property, to sustain a nuisance cause of action, resulting in monetary damages.
This court holds that defendants have substantially and unreasonably interfered with their neighbors’ use and enjoyment of their premises sufficient to support a monetary award in the amount of $25,000 and $5,000 in punitive damages in accordance with this decision.
The parties live in symmetrically identical semiattached, legal one-family houses. Each dwelling consists of an upper bi-level dominant unit, a lower single level unit and a garage located in the lower part of the front of the house. The plaintiffs rent their lower unit, whereas defendant Gay Vallone, the record owner, allows her son, defendant Joseph Vallone, to occupy her lower unit.
At trial plaintiffs testified that the intrusive sounds began when defendants moved into their home in March 1991, and defendant Joseph Vallone began conducting live heavy metal band practice in his garage every Sunday, inclusive of Palm Sunday and Easter, from 12 noon to about 5 o’clock in the afternoon, consisting of electrically amplified vocals, guitar, drums and bass, producing loud and intense sounds that were audible throughout their entire house, causing walls and floors to vibrate, crystal and dishes to rattle and shake, resulting in plaintiffs’ mental distress, annoyance and deprivation of the reasonable use and enjoyment of their property. During such times plaintiffs were unable to comfortably listen to television programming and would at times resort to leaving the house. Joseph Vallone did not dispute that band practice took place on Sundays from 12 noon to five in the afternoon, but that band practice lasted only one or two hours at a time with the garage door closed. He stated he had soundproofed his downstairs apartment by installing extra walls with insulator fiberglass, acoustic tiles on the ceiling and storm windows, and that band practice stopped in July 1991.
Plaintiffs testified to the continuous interruption to their lives caused by Joseph Vallone’s loud music playing and other *448 conduct, condoned by Gay Vallone. Plaintiffs, Michael and Concetta Stiglianese, and their daughter Diane, maintained a detailed descriptive journal from March 1991 to June 1994, containing more than 350 entries consisting of the date and time of sound disturbances originating from the Vallones’ home. The Stiglianeses were awakened from their sleep by Joseph Vallone’s car stereo on 23 separate occasions late at night or during the early morning hours. They experienced 85 separate instances where the sound levels caused vibrations in their home. They recorded 94 entries where the decibel level in their home was over 60 to 100 decibels.
The journal was admitted into evidence without objection by defendants’ attorney.
The Stiglianeses also testified that Joseph Vallone played his car stereo in the driveway when he washed his car, which was audible to them and the surrounding neighborhood. Joseph Vallone did not deny playing his car stereo in the driveway; rather, he stated that his car windows would never be down due to air conditioning in the summer and heat in the winter. The Stiglianeses further testified that Joseph Vallone played his portable radio at a disturbingly high level in his backyard while singing alone or along with friends, or while tanning himself. Finally, the Stiglianeses testified to their innumerable complaints to Joseph and Gay Vallone, without success.
Joseph Vallone essentially testified that his music was not disruptive and within normal limits on all occasions. He stated he soundproofed his basement and purchased a decibel meter which he calibrated to 65 decibels at 25 feet, at a different floor level, from the sound source of his 200-watt stereo, set at a sound level between 6 and 7 out of a maximum of 30, based upon his belief that the New York City limits were 65 decibels during the day and 60 decibels at night.
The court found plaintiffs’ evidence most credible, whereas defendants’ evidence was found, essentially, to be an attempt to minimize and deflect their unacceptable conduct.
To prevail upon a cause of action for private nuisance, plaintiffs must prove that defendants’ interference with their right to use and enjoy their property was substantial in nature, intentional in origin, unreasonable in character, and that it was caused by defendants’ conduct or failure to act. (See, Co-part Indus. v Consolidated Edison Co., 41 NY2d 564 [1977]; Langan v Bellinger, 203 AD2d 857 [3d Dept 1994].) It has been held that the law " 'relating to private nuisances is a law of degree and usually turns on the question of fact whether the *449 use is reasonable or not under all the circumstances.’ ” (Christopher Owners Corp. v Summit Off. Supply, NYLJ, Feb. 3, 1995, at 26, cols 2, 3 [Sup Ct, NY County], quoting McCarty v National Carbonic Gas Co., 189 NY 40, 46 [1907].)
This court finds that defendants’ interference with the plaintiffs’ right to use and enjoy their property was substantial in nature, intentional in origin and unreasonable in character. The heavy metal rock music and singing from defendant’s band rehearsals were unreasonable, although conducted only on Sundays. The defendant’s playing of his car radio in the driveway was unreasonable under the particular circumstances of the proximity of his neighbors. The fact that it awoke plaintiffs from their sleep on a sporadic basis made the music from the car radio sufficiently intrusive to constitute a nuisance. (Cf., Murphy v Hitchcock, 150 Misc 36 [Sup Ct, Westchester County 1934] [maintenance of barking and howling dogs in kennel which disturbed neighbors’ sleep deemed a nuisance].) While isolated or infrequent episodes of annoying or offensive conduct would not rise to the level of nuisance, defendant’s use of his personal property and residential comforts rose to the level of nuisance when his use exceeded reasonable boundaries. Reasonable boundaries are crossed when one’s use of one’s property injures another’s legal right to the reasonable use and enjoyment of the other individual’s property. (See, e.g., Murphy v Hitchcock, supra; Andrews v Perry, 127 Misc 320 [Sup Ct, Onondaga County 1926] [operation of hot dog stand enjoined in residential neighborhood]; Peters v Moses, 259 App Div 307 [1st Dept 1940] [dance pavilion enjoined from permitting outdoor music played after 11:00 p.m. during weekdays and 12 midnight on weekends]; Burk v High Point Homes, 22 Misc 2d 492 [Sup Ct, Nassau County 1960] [nuisance established by defendant’s use of his land which caused damage to adjoining properties]; Town of Preble v Song Mtn., 62 Misc 2d 353 [Sup Ct, Cortland County 1970] [defendant enjoined from conducting outdoor music festival because it would substantially interfere with rights of general public in the vicinity].)
We live in an era of high population density where urban areas are replete with noise. In the New York metropolitan area we are familiar with the daily cacophony created by flying jets, wailing emergency vehicle sirens, garbage truck collections, excavation and drillings by utility companies, roaring and screeching subway and elevated trains, hissing and braking vehicular traffic, whining car alarms, barking dogs, and the *450 resonating and reverberating booming sounds from personal and automobile radios.
"With changing social conditions, complicating urban life especially, the law must adopt legal principles to meet new arising necessities.” (Peters v Moses, 171 Misc 441, 443.) The New York City Noise Control Code, Administrative Code of the City of New York § 24-201 et seq. (hereinafter Noise Code), is a modern statutory vehicle that complements and supplements the common-law parameters of the extent, nature and intensity of permitted noise levels in our urban setting.
The Noise Code was enacted in 1972 for the purpose of reducing "the ambient noise level in the city, so as to preserve, protect and promote the public health, safety and welfare, and the peace and quiet of the inhabitants of the city * * * It is the public policy of the city that every person is entitled to ambient noise levels that are not detrimental to life, health and enjoyment of his or her property * * *[1] For the purpose of controlling and reducing such noises, it is hereby declared to be the policy of the city to set the unnecessary noise standards and decibel levels contained herein and to consolidate certain of its noise control legislation into this code.”[2] (Administrative Code, tit 24, ch 2, subch 1, § 24-202 [formerly § 1403.3-1.03].)
Indeed, the Noise Code has made provision to prohibit radio playing in the city subways that are audible to other passengers (Administrative Code § 24-220), and operation of an automobile alarm unless it automatically terminates after no more than 10 minutes of its activation (Administrative Code § 24-221 [d]).
At trial Joseph Vallone alleged compliance with the Noise Code. He stated that in his good-faith effort to comply he purchased two sound level meters in July 1991.[3] It was not disputed that the meter accurately measured sound in decibel increments in compliance with the Noise Code, and that he *451 made the sound measurements at an "A” setting.[4] Joseph Val-lone stated that he followed the manual instructions and measured sound levels inside his home with the meter at least 25 feet away from the sound source.[5] Then he adjusted his stereo so that it would not play above 65 db(A) inside his home; he deduced that if he played within legal levels inside his home, then that volume would be "okay” to play outside the home. It was his understanding that the maximum sound level permissible in New York City was 65db(A) during the day and 60 db(A) at night.
It appears, however, that by his own admission, Joseph Val-lone is in violation of the Noise Code for consistently playing music above the noise level allowed in his residential zone. Judicial notice is taken that the residential zoning designation for the subject premises is R3-2. The Noise Code defines an R3 designation as an Ambient Noise Quality Zone N-l, allowing 60db(A) as the daytime standard, and 50db(A) for the nighttime. (See, Administrative Code § 24-243.)
Inadvertently or not, Joseph Vallone set his stereo system at a level above the legal permissible standard since at least July 1991, when he purchased the sound meters. In fact, the level Joseph Vallone set for his music system is above the legal sound limit allowed for commercial music produced by a commercial establishment, as measured inside a residential unit, which is 45db(A). (Administrative Code § 24-241.1; cf., Eiffel Tower Dev. Corp. v Sweet Jane, NYLJ, Aug. 17, 1992, at 23, col 6 [Sup Ct, NY County 1992] [defendant bar and discotheque was issued noise violation for playing music which measured a noise reading of 53db(A) on at least one occasion].)
Defendants chose not to address any of plaintiffs’ numerous journal entries which indicated meter readings above "60 decibels” in their home through cross-examination. However, although no testimony was offered as to the quality of plaintiffs’ sound meter, or their practical use thereof, plaintiffs’ *452 journal entries of decibel readings are deemed admitted without opposition. (Cf., Mandel v Geloso, 206 AD2d 699 [3d Dept 1994] [expert’s testimony regarding element of unreasonableness as to noise generated by hotel air-conditioning equipment was permitted, even though expert failed to show that the units he had compared were the same as unit in question, partially because expert’s testimony was not challenged during cross-examination].)
Historically, courts have been reluctant to award damages even after a finding of private nuisance. (See, e.g., Murphy v Hitchcock, 150 Misc 36, supra; Andrews v Perry, 127 Misc 320, supra; Peters v Moses, 259 App Div 307, supra; Town of Preble v Song Mtn., 62 Misc 2d 353, supra.) The most plaintiffs could expect would be an injunction, and if the defendant was a business, the offending entity was usually enjoined from operating during nighttime hours. (See, e.g, Modugno v Merritt-Chapman Scott Corp., 17 Misc 2d 679 [Sup Ct, Queens County 1959]; City of Rochester v Charlotte Docks Co., 114 NYS2d 37 [1952]; Horne v Mt. Vernon Die Casting Corp., 181 Misc 758, mod on other grounds 267 App Div 671 [1st Dept 1944]; Walker v Wearb, 6 NYS2d 548 [Sup Ct, Chenango County 1938].) In Buffalo Park Lane v City of Buffalo (162 Misc 207 [Sup Ct, Erie County 1937]), defendant parking lot was regulated as to prevent the lighting of automobile headlights from shining on plaintiffs’ homes. Even today, the preliminary injunction may be limited to a restriction that defendant operate during day hours only. In Christopher Owners Corp. v Summit Off. Supply (supra), the warehouse business was enjoined from operating from 11:00 p.m. to 6:30 a.m. during the week and from 11:00 p.m. to 8:00 a.m. on weekends.
In parity with the courts’ historical wariness to render damages for noise nuisance has been the courts’ aversion to make a finding for noise nuisance in the first instance. The prevailing philosophy has been that noise and odors are an inescapable reality of urban life. (Andrews v Perry, supra; Peters v Moses, supra; Matter of Louisiana Leasing Co. v Sokolow, 48 Misc 2d 1014 [Civ Ct, Queens County 1966] [noise created by young children, ages 2 and 4, in overhead apartment not deemed excessive].) Consider the holding in Matter of Twin Elm Mgt. Corp. v Banks (181 Misc 96 [Mun Ct 1943]), wherein the court held that a young tenant’s piano playing for about 12 hours daily was not a nuisance since "mere annoyance in and of itself does not create a nuisance.” (181 Misc, at 97, supra.)
Similarly, other cases have found that daily practice of musical instruments are permissible despite neighbors’ complaints *453 of noise nuisance. (Elliman & Co. v Karlsen, 59 Misc 2d 243 [Civ Ct, NY County 1969] [daily one-hour drum playing permitted]; Florence Realty Co. v Shakespeare, NYLJ, Aug. 12, 1977, at 12, col 3 [Civ Ct, NY County] [daily six-hour guitar playing permitted].) In Justice Ct. Mut. Hous. Coop. v Sandow (50 Misc 2d 541 [Sup Ct, Queens County 1966]), the efforts of a cooperative housing board to restrict the playing of musical instruments to one and one-half hours per day per person, and prohibiting any playing after 8:00 p.m., was unsuccessful, the court finding that such a restriction was arbitrary and unreasonable.
More recently, disturbed neighbors have attempted to prosecute noise offenders in the criminal forum, also without success. In People v Cifarelli (115 Misc 2d 587, 588 [Crim Ct, Queens County 1982]), neighbors in a residential area brought a case for criminal harassment against defendant because of his daily drum playing. The court stated that the "development and practice of one’s musical talents is just as much a pursuit of a legitimate business or livelihood as the operation of a factory or auto repair shop which also necessarily involves the emanation of sounds or noises.” The court held that the proof was insufficient to prove the criminal charge, and that defendant’s conduct was not a subject for criminal prosecution, citing People v Markovitz (102 Misc 2d 575 [Crim Ct, NY County 1979]). In dictum, the court stated that defendant’s conduct was also insufficient to support even a claim for private nuisance since "musical instrument practice” is one of the "certain inconveniences which people living in populous areas must tolerate.” (Supra, at 589.)
Significantly, Joseph Vallone is not a musician or artist in pursuit of excellence in a vocation. There was no testimony that Joseph Vallone makes a living playing a musical instrument. (Cf., People v Cifarelli, supra.) Thus, whether or not Joseph Vallone is a musician by profession was simply not alleged by defendants.
At this juncture, since a finding of private nuisance has been determined, the issue of damages must be addressed. Not surprisingly, there is no specific rule as to the measurement of damages for a private nuisance, each award being limited to the specific circumstances of each case. For example, in Andrews v Perry (supra), where defendant operated a hot dog stand in a residential neighborhood, the court stated that damages would be determined by the difference in the rental value of plaintiffs’ property before and after the nuisance. However, *454 the court found: "While there is some evidence that the existence of the stand has depreciated the rental value of each flat ten dollars a month, it does not appear that plaintiffs have actually lost that sum. I think it must be held that the actual money loss which the plaintiffs have sustained by reason of the maintenance of this nuisance is nominal, and I award one dollar as such damage.” (127 Misc, at 327, supra.)
In Burk v High Point Homes (22 Misc 2d 492, supra), the court awarded the actual cost incurred by plaintiffs in repairing the damage to their land caused by defendant’s unreasonable use of his property. In Boomer v Atlantic Cement Co. (72 Misc 2d 834 [Sup Ct, Albany County 1972]), the court enjoined defendant from operating its cement plant until defendant paid the sum of $175,000. After a thorough analysis, the court applied a five-tier test, including a comparison of the fair market value of plaintiff’s property without the nuisance ($265,000) and its value with the nuisance ($125,000). Unfortunately, the complicated formula utilized in Boomer is not useful in the instant action since the defendant in Boomer was a commercial entity, the element of the private nuisance established was dirt, smoke and vibrations, and the nuisance was permanent since defendant was not required to move or cease operations once the injunction was lifted.
In the landlord-tenant context, damages for noise nuisance may be recovered as an abatement in rent for the landlord’s breach of the warranty of habitability, where a residential lease is in effect. (Real Property Law § 235-b; Little v Robinson, NYLJ, Apr. 13, 1993, at 25, col 1 [App Term, 1st Dept] [40% reduction in rent awarded for period of noise nuisance caused by defectively mounted rooftop exhaust fan located above tenant’s living room]; Regency Joint Venture v Goodman, NYLJ, May 12, 1993, at 30, col 2 [Civ Ct, NY County] [tenant entitled to 15% rent abatement of monthly rent due to landlord’s breach of warranty of habitability, due to excessive noise and odors from bakery on ground floor of building].) Where the tenant is found culpable of the noise nuisance, the landlord may be awarded a possessory judgment evicting the tenant. (Gerber v Gentry, NYLJ, Apr. 18. 1990, at 23, col 1 [Civ Ct, NY County].)
As the foregoing cases demonstrate, the law on private nuisance for noise, as it stands today, does not offer the plaintiffs herein a definitive measure for the recovery of damages. The depreciation of the plaintiffs’ property during the nuisance provides one measure of damages; and the civil penal *455 ties set forth in the enforcement chapter of the Noise Code offers a useful guide in this area.[6]
CCA 110 grants this court the equitable power to issue injunctions and restraining orders for the enforcement of housing standards. It is settled that this court has subject matter jurisdiction to issue an injunction to enforce the Noise Code. See, Central Park Gardens v Klein (107 Misc 2d 414 [Civ Ct, NY County 1980]), where the court enforced that section of the Noise Code which prohibits any person from permitting an animal under his control to cause unnecessary noise. It naturally follows that if this court has subject matter jurisdiction to issue an injunction based on Noise Code violations, this court may utilize table V which sets forth actual amounts for each violation of the Code, in its determination of damages. While table V states that the civil penalty for a violation of section 24-243 (the section violated by defendants herein) is between $660 at a minimum and a maximum of $2,625, there is no precedent which prevents this court from multiplying each violation claimed by plaintiffs by the civil penalty. This court is cognizant that there was no expert testimony as to the accuracy of plaintiffs’ meter readings, nor any Noise Code violations or determinations issued by the Environmental Control Board. Therefore, this court will weigh the impact of plaintiffs’ testimony and consider the 94 incidences recorded in plaintiffs’ journal where decibel readings inside their home were in excess of the permissible noise levels set forth in the Noise Code. The sounds were created by amplified stereo equipment operated by Joseph Vallone. Each such recorded occurrence measuring decibels above 60db(A) from 7:00 a.m. to 10:00 p.m., or above 50db(A) after 10:00 p.m. constitutes a violation of section 24-243 of the Code. Multiplying the 94 recorded occurrences by the minimal penalty amount of $660 for a violation of section 24-243 (the maximum amount is $2,625), the total amount of damages awarded to plaintiffs is $62,040.
The court takes into account that the trial did not establish plaintiffs’ expertise of the operation of the noise sound meter, nor did a noise expert testify for either side. However, plaintiffs’ testimony regarding same was credible, since noise which would cause crystal to shake and/or walls and floors to vibrate does not require an expert’s opinion. See, e.g., Eiffel Tower v Sweet Jane (supra), where police officer’s issuance of a *456 summons for noise was upheld even though the officer did not use a noise meter: "Common sense would dictate that the level of music repercussion sound heard by Sergeant Sikorski after midnight as far as 200 to 300 feet away from the Club which caused windows to vibrate and rattle well exceeded the City legal limit of 45dB(A).” (NYLJ, Aug. 17, 1992, at 24, col 2, supra [emphasis added].)
Plaintiffs’ journal contained many such entries describing the vibration of their floors and walls.
In awarding this judgment amount, this court accounted for the following: (1) plaintiffs established that the noise condition existing at the premises was of an overwhelmingly intrusive nature as to actually deprive them of the reasonable enjoyment of their own home; (2) the 94 occurrences noted above are in addition to the numerous occurrences of being awakened by defendant’s automobile radio in the driveway, defendant’s playing his stereo in the house, driveway and backyard, or musical instruments in the house; (3) the persistent and continuous nature of defendants’ intrusive conduct into plaintiffs’ lives; (4) the unpredictability of each occurrence wherein plaintiffs were subjected to excessive, intrusive sounds; (5) the unpredictability of the length of each such intrusion; and (6) the fact that neighbors other than plaintiffs complained of excessive and unreasonable noise caused by the amplification of defendants’ audio equipment, and that such neighbors were further distanced from defendants than plaintiffs and did not share an adjoining wall with defendants.
An alternative measure of damages is the amount of depreciation suffered by the plaintiffs as a result of the nuisance. Both sides produced licensed real estate brokers as expert witnesses during the damages portion of the trial who testified as to the market and rental value of the property. Plaintiffs’ witness essentially testified that the value of plaintiffs’ property as a rental, without consideration of the lower unit, was $1,300 a month for the period of the nuisance. The lower apartment was composed of approximately 22% of the gross living area. Defendants’ expert testified that the rental value of plaintiffs’ home was $900, with $100 to $150 more for a home with an extended deck such as the plaintiffs have. The court finds the rental value of the plaintiffs’ home was $1,200 a month, less $264 representing 22% of the gross living area represented by the lower rental unit, leaving a rental value of $936 a month. The court determines that due to the nature, extent and intensity of the nuisance, combined *457 with the sporadic, intermittent, unpredictable nature thereof, plaintiffs lost the beneficial use of reasonable enjoyment to their home for 39 months. This court does not and will not credit defendants with days or weeks where no disturbances were noted. This court holds that the depreciation was continuous due to the nature and unpredictability of the nuisance coupled with its sufficient continuity and intensity, to actually deprive the plaintiffs of the reasonable and beneficial enjoyment of their own home throughout the entire period of the nuisance. Therefore, the rental value of $936 a month multiplied by 39 months equals $36,504.
The measure of damages pursuant to the Noise Code formulation of $62,040, and the measure of damages pursuant to the depreciation formulation of $36,504 are both moot, since this is a court limited to awarding up to $25,000 per cause of action. Therefore, this court awards plaintiffs $25,000 on its sole cause of action.
Gay Vallone condoned her son’s actions. She had knowledge of her son’s conduct and allowed it to continue, unabated for over three years. Although there is no affirmative misconduct on the part of Gay Vallone, she is not relieved of liability. She had legal control of the premises and therefore an affirmative duty to abate the nuisance. (See, State of New York v Monarch Chems., 90 AD2d 907 [3d Dept 1982].)
This court further awards plaintiffs $5,000 representing punitive damages. Joseph Vallone’s conduct was egregious, malicious, wanton and reckless. He allowed himself instant gratification of his musical appetites, manifested on various occasions with taunts, and at all times with complete and utter disregard to plaintiffs’ interests. (See, Sharapata v Town of Islip, 56 NY2d 332 [1982]; Walker v Sheldon, 10 NY2d 401 [1961].) Plaintiffs have presented sufficient and detailed proof to sustain an award of punitive damages setting forth the circumstances surrounding the incidents exhibiting or explaining the motives, or lack thereof, of the defendants. (See, Laurie Marie M. v Jeffrey T. M., 159 AD2d 52 [2d Dept 1990], affd 77 NY2d 981 [1991].) Although Joseph Vallone’s conduct was not specifically directed to the public, an award of punitive damages is appropriate since punitive damages are intended to *458 punish and deter defendant, as well as others, from engaging in similar conduct in the future. (See, Walker v Sheldon, supra.)

. "Ambient noise” is defined as "the all-encompassing noise associated with a given environment, being usually a composite of sounds from many sources near and far”. (Administrative Code § 24-203 [g].)

. "Unnecessary noise” is defined as "any excessive or unusually loud sound or any sound which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of a person, or which causes injury to plant or animal life, or damage to property or business.” (Administrative Code § 24-203 [aaa].)

. A "sound level meter” is defined as "any instrument including a microphone, an amplifier, an output meter, and frequency weighting networks for the measurement of noise and sound levels in a specified manner and which complies with standards established by the American National *451 Standards Institute specifications for sound level meters Sl.4-1971, as amended.” (Administrative Code § 24-203 [rr].)

. The Noise Code states that the leVel of noise may be measured by meters using either the "A” weighting network, whose unit of measurement is the db(A), or by meters using the "C” weighting network, which unit of measurement is the db(C). (Administrative Code § 24-203 [a], [n], respectively.) Defendant’s meter contained both A and C weightings; Mr. Vallone testified that he measured the sound levels at the "A” setting.

. This distance is in compliance with section 24-243 (b) (5) which states that "noise measurements shall not be made at a distance less than twenty-five feet from the edge of-a noise source.”

. Subchapter 8, Enforcement, sets forth a chart, table V, listing the maximum and minimum civil penalties which should be imposed relating to which section was violated. (Administrative Code § 24-257.)